IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2006

## STATE OF TENNESSEE v. ISSAC SCOTT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-04821  Paula Skahan, Judge**

**No. W2005-02902-CCA-R3-CD  - Filed December 28, 2006**

The Defendant, Issac Scott, was convicted of first degree murder and received a life sentence.  On appeal, the Defendant contends that the evidence presented at trial was insufficient to support his conviction.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Garland Ergüden, (on appeal), and Amy Mayne and Cliff Abeles, (at trial), Memphis, Tennessee, for the Appellant, Issac Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Paul Goodman and Anita Spinetta, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

## I.  Facts

This case arises from the Defendant's conviction for first degree murder.  The following evidence was presented at trial:

Derome Flemming testified that he frequented the Gentleman's Club where the victim worked and that he saw her on December 13, 2002.  On that night the Defendant came to the club and spent a few hours with the victim.  Flemming noticed that the Defendant talked to himself and laughed out loud.  He explained that people at the club called the Defendant "psycho."  Around 1:00 a.m., the victim asked Flemming to take her home, and then around 1:55 a.m. she told him that she

planned to leave with the Defendant. She said that the Defendant seemed like a good guy and just wanted to cook her breakfast and talk. Flemming watched the victim get inside the Defendant's car. On cross-examination, Flemming acknowledged that the Defendant and the victim appeared to have an amiable conversation inside the club that lasted for two hours.

Tony Covington testified that the victim was his oldest daughter. He noticed that she often was not home at 5:00 a.m. on Saturdays and learned that she worked at the Gentleman's Club. He tried to persuade the victim to quit this job but failed. He knew the victim planned to work at the club on the evening of December the 12th and the morning of December the 13th. On December 13th, the victim did not respond to phone calls and text messages that she received from her family. The victim's family became concerned and searched for her. Eventually law enforcement personnel became involved with the search and located the victim's body.

Shanitra Meadows testified that she was the victim's co-worker at the Gentleman's Club. Meadows worked at the club on December 13, 2002, and the Defendant offered to cook her breakfast if she came to his house. She saw the victim talk with the Defendant for most of the night, which is the last time she saw the victim alive. On cross-examination, Meadows testified that the victim and the Defendant seemed to have a friendly conversation. Meadows served the victim drinks but could not recall how many and did not know how often the victim drank. She acknowledged providing the police with a statement that asserted that the victim drank hard liquor and took Zantac and Valium.

Officer Roland Filsinger described how he investigated the victim's disappearance and learned that she was last seen with the Defendant. He spoke with the Defendant, asking what the Defendant knew about the victim's disappearance. The Defendant denied leaving the club with the victim and said that he left the club around midnight. On cross-examination, Officer Filsinger testified that he spoke with Flemming and learned that an employee at the Gentleman's Club told Flemming that the victim went on a "one hundred and fifty-dollar date." On redirect examination, Officer Filsinger agreed that Flemming heard about the alleged "one hundred and fifty-dollar date" from another individual and had no first hand knowledge about this "date."

Officer Cecil Fowler testified that he received a call through his dispatcher to investigate the victim's disappearance. He responded to this call and went to the Defendant's trailer with other officers and searched the trailer. Officer Fowler noted that the Defendant was cooperative and signed consent to search forms for the Defendant's car and residence.

Dr. O'Brian Cleary Smith testified as an expert in forensic pathology. He described how he performed an autopsy on the victim on December 30th, the day her body was discovered. He also visited the crime scene where her body was located. He identified photographs of the crime scene and the victim's body. The victim's body was partially covered with grass and lay near a point where a culvert, five to seven feet deep, ran underneath a road. Consequently, viewing the victim's body from the road proved difficult. Dr. Smith noted that, due to the difficulty of viewing the body, he considered whether someone purposefully placed grass on top of her but could not draw any

definite conclusions because so much time had passed since the victim first disappeared. Dr. Smith described the victim's clothing and explained why he believed that her garments' positioning had not changed since she was left in the culvert. He noted that the victim wore slacks and had a belt that was tucked inside her pants and was not fastened around her waist. He also noted that the victim's peacoat had been unbuttoned. Photographs entered into evidence revealed that the victim's bra had been pushed above her breasts.

Dr. Smith described certain aspects of the victim's physical condition which led him to conclude that the victim experienced manual strangulation. He found bruises on her neck that he attributed to "compressive force applied to the neck sufficiently strong to bruise the skin." He discovered bruises on some of the victim's neck tissues underneath her skin and blood in the lining of her lower right eye lid. He noticed that the victim's lungs had filled with fluid, exhibiting a condition associated with the deranged blood flow and irregular heartbeat that may accompany strangulation. Dr. Smith also noticed bleeding on both sides of the victim's hyoid bone and voice box. He explained that compressive forces applied to the victim's neck caused these structures to bleed, and the victim died before her body could react by sending white blood cells to these structures. He explained that an individual would need ninety seconds in order to render another unconscious through the process of strangulation. He determined that compression of the victim's neck with the possible contributory cause of hypothermia caused the victim's death. Due to the victim's position and her garments' undisturbed arrangements, Dr. Smith concluded that the victim made little or no movement once placed in the culvert. He noted that an unconscious individual may suffer from a greater susceptibility to death by hypothermia due to an inability to shiver and generate body heat.

Dr. Smith testified that the victim had bruises, which occurred shortly before her death, on her arms and two areas on her right hand. He also noted that the victim's genitalia had red abrasions on both the labia majora and minora that had resulted from a friction force that had removed the top layer of skin, causing "active bleeding." He noted that white blood cells did not come to this area and determined that these injuries occurred about the same time as the bruises on the victim's neck and on her right hand.

Dr. Smith testified that in January following the victim's death in December he examined injuries on the Defendant's arm and estimated that the injuries had been inflicted at least six months earlier. He explained that the Defendant's injuries had healed too well to have occurred when the victim's murder occurred. Dr. Smith testified that the Defendant's scars appeared to be self-inflicted injuries because they consisted of shallow cuts that were repetitive and parallel to each other.

On cross-examination, Dr. Smith acknowledged that one could view the victim's body from the road after stepping out of a car and looking down into the culvert. He did not discover any internal vaginal injuries or the presence of semen inside the victim. Dr. Smith acknowledged that the victim could have been unconscious and breathing on her own when left in the culvert. He noted that the victim's kidneys were in a condition that can occur when the body suffers from hypothermia. On redirect examination, Dr. Smith testified that a person who had been strangled and rendered

unconscious yet was still breathing would ultimately die if left in a culvert without receiving any assistance.

Serita Covington, the victim's sister, described the last time she spoke with the victim and how she became concerned about the victim's whereabouts. She testified that the victim drank socially but did not use drugs. On cross-examination, Serita Covington testified that she did not socialize with her sister at the Gentleman's Club.

Sergeant William D. Merritt, a homicide sergeant with the Memphis Police Department, described how he investigated the victim's homicide. Sergeant Merritt interviewed the Defendant twice. During the first interview, the Defendant stated that he left the Gentleman's Club by himself around midnight and went home. Sergeant Merritt again questioned the Defendant and confronted him with inconsistencies between his statements and statements provided from other witnesses. During this second interview, the Defendant provided Sergeant Merritt with the following statement:

> On Thursday, December 12th, I went inside the Gentleman's Club to see the waitress named Shanitra. I took a seat in the back and that's when [the victim] came up to me and asked me for a dance. I told her that I didn't want one. Then, a man came in selling roses. I bought one for Shanitra. Then, I gave the rose to Shanitra then went back to [my] seat and sat down. [The victim] came back over and we were talking about Christmas and stuff. Then, Shanitra came back and sat on my lap. [The victim] came back and sat in the back where we were sitting and we finished talking about Christmas stuff. Then, she asked if I would come back and pick her up. I stated, yes. Around twelve a.m. I went up to the bar and told Shanitra I was fixing to go. Then, I left. I arrived back at the Gentleman's Club between two to 2:30 [sic] to pick [the victim] up. After picking [the victim] up we then proceeded to my house. In route to my house I asked her what was up and what she was going to do. She told me in order for us to f*ck I had to give her two hundred and fifty dollars. And, I told her she done lost her damned mind. Then, she went to fumbling through her bags and I asked her what she was looking for and she said don't worry about it. And, she pulled out a little blade and put it to my neck. And, I pushed her arm out of the way and she cut me twice on my left arm. I then grabbed her and choked her until she passed out. Then, I drove to Holmes Road, turned on Pleasant Hill and pushed her out of the car.

The Defendant also claimed that the victim was alive when he left her in the culvert, and he heard her moan. Sergeant Merritt testified that his co-workers went to the location that the Defendant described and found the victim's remains. On cross-examination, Sergeant Merritt acknowledged that the Defendant cooperated with him and provided a DNA sample.

Natasha Andrew, who previously lived with the Defendant, testified that she saw him cut himself on the arm with a knife. She took him to a hospital, and the Defendant told the doctors that he had received the scars during a knife fight. On cross-examination, Andrew testified that she saw

the Defendant make all the cuts on his arm at the same time.

The Defendant and the State entered the following stipulation into evidence:

The body of [the victim] was swabbed during her autopsy to preserve evidence. Donna C. Nelson, Special Agent, Forensic Scientist, employed by the Tennessee Bureau of Investigation examined swabs from three areas of [the victim's] body. It was Ms. Nelson's opinion from scientific testing that vaginal swabs, anal swabs, and oral swabs, failed to reveal the presence of semen.

Based upon this evidence the Defendant was convicted of first degree murder.

## II. Analysis

On appeal, the Defendant contends that the evidence presented at trial was insufficient to support his conviction for first degree murder. Specifically, he asserts that the evidence is only sufficient to support a conviction for second degree murder or voluntary manslaughter. The State contends that the evidence is sufficient to support the Defendant's conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Under Tennessee Code Annotated section 39-13-202(a)(1) (2003), first degree murder is the premeditated and intentional killing of another person. A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. Id. Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the offense. State v. Berry, 141 S.W.3d 549, 566 (Tenn. 2004). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003) Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include: the particular cruelty of a killing; any advance preparations taken to conceal the crime; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing. Id. at 614. These factors are not exhaustive. A jury is not limited to any specific evidence when determining whether a defendant intentionally killed the victim "after the exercise of reflection and judgment." Id. at 615 (citing Tenn. Code. Ann. § 39-13-202(d) (1991 and Supp. 1995)). Additional factors indicative of the existence of premeditation include a lack of provocation on the part of a victim, and the Defendant's failure to render aid to a victim. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The evidence, when viewed in a light most favorable to the State, reveals that there are numerous circumstances from which the jury could conclude that this murder was premeditated. We observe that: (1) the victim was unarmed; (2) the Defendant attempted to hide evidence of the killing, (3) the Defendant failed to render aid to the victim.

The evidence presented at trial established that the Defendant admitted that he strangled the victim until she passed out which, according to Dr. Smith's testimony, required that the Defendant strangle the victim for at least ninety seconds. Even if the victim was alive when the Defendant left her, he did not attempt to render aid to the victim. Instead, he left her in a culvert to die alone in the cold. The Defendant attempted to hide evidence of the killing, placing the victim's body in a culvert five to seven feet deep and making her body difficult to view from the road. When initially questioned about the murder, the Defendant denied leaving the club with the victim and only acknowledged his involvement with the crime after he knew that other witnesses had identified him as the last person seen with the victim. The Defendant's deception and calculating behavior during his interactions with law enforcement personnel can be indicative of premeditation. See Davidson,

121 S.W.3d at 615 (noting that the defendant's cunning course of conduct during interrogation by law enforcement suggested premeditated murder in that case). The Defendant claimed that the victim provoked his actions and that he acted in self-defense. However, no provocation need be inferred from the evidence. Testimony from both Dr. Smith and Andrews contradicted the Defendant's claims. Furthermore, we note that the state of the victim's clothing and the abrasions on her labia minora and labia majora indicate that the Defendant sexually attacked the victim during the course of the murder. This evidence does not correlate with the Defendant's testimony. Accordingly, the jury's verdict of guilt is sufficiently supported by the evidence. For this reason, we reject the Defendant's argument that the evidence is only sufficient to support a conviction for second degree murder or voluntary manslaughter. We cannot disregard the jury's resolution of questions of witness credibility, weight and value of the evidence, and substitute our own inferences from the evidence. Id.

### III. Conclusion

Based upon the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-7-